UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**YARITZA MORALES RIVERA**,            Case Number 3:13 CV 772

Plaintiff,                                            Judge Jeffrey J. Helmick

        v.                                            REPORT AND RECOMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

Defendant.                                        Magistrate Judge James R. Knepp, II

## INTRODUCTION

Plaintiff Yaritza Morales Rivera seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated April 8, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on September 10, 2009, claiming she was unable to work due to a brain tumor and back problems. (Tr. 262, 264, 293). Her claim was denied initially and on reconsideration. (Tr. 102, 106, 111, 115). At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ"). (Tr. 49, 121). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 24, 49). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On April 8, 2013, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Plaintiff's Vocational and Personal Background*

Plaintiff was 27 years old at the time of her alleged disability onset date on May 25, 2009. (Tr. 30, 41). She grew up in Puerto Rico where she obtained a seventh-grade education, and has prior relevant work experience in the United States as a packer, kitchen worker, and waitress. (Tr. 41).

Plaintiff lived in a house with her significant other and three children. (Tr. 339-40). With respect to daily activities, Plaintiff made breakfast for her significant other; got her kids ready for school; walked the children to and from school; maintained personal care, although she would get dizzy at times; prepared "home cooked" meals daily; cleaned, washed dishes, swept, ironed, and did laundry, sometimes with the help of her significant other; grocery shopped with others either twice a week or once every two weeks; listened to music; watched television; played with her kids on PlayStation; talked with friends and family; went out to eat at restaurants; and sometimes spent the weekend with friends. (Tr. 317-20, 340-43, 543). However, on a physical therapy intake sheet, Plaintiff indicated she had significant difficulty maintaining personal care, standing at the sink, getting dressed, carrying jars or packages, reaching into the washing machine, vacuuming, sweeping, changing the bed, and getting in and out of a car. (Tr. 736). Plaintiff further said she enjoyed dancing, walking, and playing with her kids. (Tr. 736).

At the hearing, Plaintiff testified through an interpreter. She said she ceased working as a tortilla packer in 2008 because she was a high-risk pregnancy. (Tr. 53-54). Plaintiff said she could not find work because she could not drive due to health reasons and dizziness, but admitted she drove herself to the hearing. (Tr. 55, 71).

2

*Evidence Related to Physical Impairments*

Plaintiff complained of persistent migraines on January 17, 2008, to Lynette M. Thuma, M.D., of W.W. Knight Family Practice ("W.W."). (Tr. 494). Plaintiff described one incident where she did not take Imitrex, went to work, and when she came back, had a full-blown headache and a painful jaw. (Tr. 494).

Plaintiff had an MRI of her brain taken on February 20, 2008, which revealed a 2.8 mm round nodule in the inferior right pituitary consistent with a microadenoma. (Tr. 495). Otherwise, the MRI was negative. (Tr. 496).

On February 25, 2008, Plaintiff was concerned that her migraines were becoming more frequent since she was put on the Depo-Provera shot. (Tr. 493). Dr. Thuma suggested she discontinue Depo-Provera and see an OB/GYN to discuss contraception options. (Tr. 493). Concerning pituitary adenoma, Dr. Thuma noted Plaintiff's hormone levels and cytology were within normal limits. Although Plaintiff's MRI revealed a 2.8 microadenoma, Dr. Thuma did not think it was related to the migraines. (Tr. 493). Regarding galactorrhea (nipple discharge), Dr. Thuma believed it was unrelated to a prolactinoma. (Tr. 493).

On May 21, 2008, Plaintiff complained of right lower abdominal pain, vague respiratory symptoms, and an irregular period. (Tr. 491). Dr. Thuma diagnosed oligomenorrhea, history of pituitary microadenoma, right lower quadrant pain (most likely ovarian cyst), and history of migraines and insulin resistance. (Tr. 491).

Plaintiff saw neurologist Ahmed Zakeri, M.D., for a consultative visit on June 23, 2008. (Tr. 501). Dr. Zakeri noted Plaintiff suffered from headaches for a number of years and had galactorrhea and amenorrhea (missed periods) for the past three months. (Tr. 501). Plaintiff's

3

physical examination was unremarkable and Dr. Zakeri suspected a prolactinoma would be responsive to pharmacological management. (Tr. 501). Dr. Zakeri prescribed an endocrine provil. (Tr. 501).

On August 5, 2008, Ian Elliot, M.D., of W.W. wrote to Shirley Bodi, M.D., to advise her that Plaintiff had a nonfunctional microadenoma of the pituitary, but Dr. Elliot did not feel it was the cause of her irregular cycles. (Tr. 500). Rather, Dr. Elliot suspected Plaintiff had a polycystic ovarian syndrome with insulin resistance. (Tr. 500). On August 26, 2008, Plaintiff sought a refill of Imitrex and Motrin from W.W. (Tr. 490).

On September 3, 2008, Plaintiff was seen by Matthew Riesen, M.D., at W.W. and found out she was pregnant. (Tr. 489). She complained of migraine headaches, nausea, and painful left foot calluses. (Tr. 489). Dr. Riesen advised Plaintiff to take Tylenol and indicated the headaches may increase in severity due to pregnancy hormonal changes. (Tr. 489). Dr. Elliot anticipated no issues with hypopituitarism during pregnancy, but advised Dr. Riesen that Plaintiff was seeing a neurosurgeon regarding her microadenoma. (Tr. 499). Plaintiff gave birth to her third child on April 27, 2009, and had a post-partum bilateral tubal litigation that day, which she tolerated well. (Tr. 386, 388).

Plaintiff suffered from sinus infections on January 13, 2009, and March 11, 2009. (Tr. 417-18). The treatment providers prescribed antibiotics. (Tr. 417-18).

On June 11, 2009, Plaintiff treated with Shelly K. Mills, D.O., at W.W. for a postpartum visit. (Tr. 416). Plaintiff indicated she was planning a trip to Puerto Rico later that month, and denied any postpartum complications, including depression. (Tr. 416). Further, Plaintiff reported no difficulty during intercourse. (Tr. 416).

4

On August 23, 2009, Plaintiff reported to the emergency room complaining of dizziness and vomiting. (Tr. 451). She was examined overnight, diagnosed with vertigo, and discharged with prescriptions for Zofran and Valium. (Tr. 453, 456).

Four days later, Plaintiff reported to Hossein Behniaye, M.D., at W.W. for a follow-up visit. (Tr. 414). She drove to the appointment and denied nausea, vomiting, vertigo, or dizziness. (Tr. 414). Further, Plaintiff indicated she was suffering from a recent viral infection and some congestion, but denied that the episodes of vertigo were related to those ailments. (Tr. 414). Dr. Behniaye advised Plaintiff against driving. (Tr. 415).

On September 4, 2009, Plaintiff saw Dr. Behniaye and complained of sudden onset right upper shoulder and right upper back pain and stiffness radiating to her neck. (Tr. 413). She was examined and diagnosed with a right shoulder trapezius strain and instructed to take Flexeril at night to minimize potential dizziness. (Tr. 413).

Plaintiff was evaluated by neurologist Ted E. Barber, M.D., M.B.A., on September 8, 2009. (Tr. 471). Since being hospitalized, Plaintiff complained of lightheadedness, loss of balance, nausea, and migraines. (Tr. 471). Plaintiff's physical examination was unremarkable and Dr. Barber ordered an MRI, 24-hour Holter monitor, and EEG. (Tr. 472, 520).

At a follow-up visit, Dr. Barber indicated Plaintiff's MRI showed no change from a year ago and her EEG was normal. (Tr. 497, 513, 515). Because Plaintiff still complained of dizzy spells, Dr. Barber ordered a tilt table examination, which came back normal. (Tr. 497, 517, 521). Dr. Barber renewed Plaintiff's prescription for Ibuprofen and also prescribed Antivert for dizziness. (Tr. 517).

5

Plaintiff treated with Dr. Behniaye on December 7, 2009 for back strain which did not improve with Tylenol. (Tr. 487). Although Plaintiff previously complained of intermittent trapezium strain, the current back pain was apparently more concerning. (Tr. 487). Plaintiff denied any other symptoms and her physical examination was unremarkable. (Tr. 487). A 2% lidocaine injection at the tender point relieved the pain. (Tr. 487).

On December 30, 2009, Plaintiff complained to Dr. Behniaye of an upper back strain, congestion with facial pressure, and headaches, which she claimed did not resolve with Tylenol. (Tr. 486). She was prescribed antibiotics and cough medicine then advised to temporarily refrain from breast feeding. (Tr. 486).

On December 8, 2010, and January 11, 2010, Plaintiff underwent physical therapy to address back pain, which she claimed had lasted for the past three years. (Tr. 485, 670).

On January 29, 2010, Plaintiff treated with Dr. Behniaye for complaints of a headache. (Tr. 654). She said she had not taken Imitrex and missed an "extensive neurological followup with a neurologist" the day before. (Tr. 654). Plaintiff said her headaches had decreased, although she had residual congestion and her upper trapezius pain had returned. (Tr. 654). Dr. Behniaye administered a second injection, which relieved the shoulder pain. (Tr. 654). She said she missed physical therapy due to difficulty securing child care. (Tr. 654).

On March 5, 2010, Plaintiff complained to Dr. Behniaye of back pain, caused in part by avoidance of pain medication due to neurologist specific studies. (Tr. 653). She claimed the physical therapists said they could not do much for her. (Tr. 653). Plaintiff complained of a headache associated with back pain, but said it was not disabling enough to interfere with her

daily activity. (Tr. 653). A radiological examination of Plaintiff's spine was unremarkable. (Tr. 667-68).

Five days later, Plaintiff told Dr. Behniaye that physical therapy did not help; a sentiment she later repeated to Dr. Castillo. (Tr. 650, 652). Dr. Behniaye diagnosed obesity, indicated medication controlled hip pain, and recommended Plaintiff continue her current medication regimen and attend physical therapy. (Tr. 652).

Plaintiff saw Michael B. Castillo, M.D., on March 18, 2010, for headaches, neck pain, back pain, and obesity. (Tr. 651). Dr. Castillo prescribed Naprosyn and Prilosec, counseled Plaintiff on initiating a diet and keeping a diet journal, and recommended using a firmer mattress. (Tr. 651).

On April 1, 2010, Plaintiff reported numbness and tingling on the left side of her face and some knee pain. (Tr. 650). Dr. Castillo noted a recent x-ray showed no abnormality or neurological deficits and suspected fibromyalgia. (Tr. 650). At a follow-up visit two weeks later, Plaintiff complained of radiculopathy in the ulnar distribution of her hand. (Tr. 649). Dr. Castillo noted Plaintiff had positive ANA, generalized myalgia, and positive Spurling sign with neck pain. (Tr. 649). She was referred to rheumatology. (Tr. 649).

On May 13, 2010, Plaintiff returned to Dr. Mills with complaints of back pain. (Tr. 648). An MRI of the cervical spine was negative and x-rays showed possible mid-thoracic anterior height loss. (Tr. 648, 664-65). Plaintiff stopped physical therapy because it was too painful and indicated her hips and fingers were bothering her. (Tr. 648). About a week later, Plaintiff complained of sinus pressure. (Tr. 647). Dr. Mills prescribed an antibiotic and recommended use of over-the-counter Mucinex and a Neti pot. (Tr. 647).

7

On June 2, 2010, Tauseef G. Syed, M.D., F.A.C.R., examined Plaintiff in response to her complaints of lower back pain and finger numbness. (Tr. 694). Following a physical examination, Dr. Syed noted tenderness all over Plaintiff's soft muscles and tissues and determined the pain was likely caused by either her brain tumor or fibromyalgia. (Tr. 696).

Plaintiff returned to Dr. Castillo on June 16, 2010, complaining of sinus pressure. (Tr. 646). Dr. Castillo referred Plaintiff to an ENT and prescribed antibiotics. (Tr. 646). On June 28, 2010, Oliver Jenkins, M.D., specialist in otolaryngology, found Plaintiff had a deviated nasal septum to the left, bilateral inferior turbinate hypertrophy with nasal airway obstruction with pale muscosa, and no purulence or polyps. (Tr. 624-25). Dr. Jenkins recommended an immunoprofile, CT sinus scan, and allergy testing. (Tr. 625).

Plaintiff followed-up with Dr. Barber on July 7, 2010, and stated she had a good response to her current regimen. (Tr. 621).

On October 5, 2010, Donna Malone, N.P., a specialist in otolaryngology, recommended Plaintiff use Flonase and Claritin to relieve her congestion. (Tr. 602-05). She also reviewed an August 26, 2010, CT scan of the paranasal sinuses, which revealed mild membrane thickening in the maxillary sinuses, nasal septal deviation to the right, and no air-fluid levels. (Tr. 614, 675).

On October 31, 2010, Jeffrey W. Branata, D.O., suspected Plaintiff suffered from sinus headaches and prescribed an antibiotic and medication for cough and throat irritation. (Tr. 645).

Plaintiff visited Sarah Prochaska-Carpenter, M.D., on November 30, 2010, for a recheck of chronic back pain and fibromyalgia. (Tr. 644). Dr. Prochaska-Carpenter noted Plaintiff had recently been diagnosed with fibromyalgia by Dr. Tauseef Syed and provided a total rehab order slip for a fibromyalgia program. (Tr. 644).

8

On December 27, 2010, Dr. Barber took Plaintiff off of Imitrex and prescribed Ultram. (Tr. 598, 671). He also recommended Plaintiff schedule a follow-up MRI scan. (Tr. 598, 671). An MRI taken January 10, 2011, indicated Plaintiff's microadenoma was stable and the remainder of the scan was unremarkable. (Tr. 596).

On February 13, 2011, Plaintiff was treated and released at the emergency room for complaints of a sore throat, dizziness, headache, and nausea. (Tr. 557-69). A CT scan taken during her treatment revealed no acute intracranial abnormality and mild sinus disease. (Tr. 565-66, 575). At discharge, Plaintiff was diagnosed with strep throat and dizziness and instructed to follow-up with Dr. Bodi if her condition worsened. (Tr. 562).

Plaintiff underwent a well-women physical exam on March 7, 2011, and complained of dyspareunia and frequent headaches with associated dizziness. (Tr. 643). She was advised to follow up with her neurologist and referred to physical therapy for fibromyalgia. (Tr. 643).

Beginning March 11, 2011, Plaintiff attended five physical therapy sessions through March 25, 2011. (Tr. 703, 721). However, she was discharged on April 21, 2011, because she cancelled or failed to show up for four scheduled appointments. (Tr. 721).

Donna Malone, N.P., examined Plaintiff on March 31, 2011, to follow-up on Plaintiff's sinus problems. (Tr. 589). Ms. Malone indicated Plaintiff had a deviated nasal septum, but otherwise had a normal examination and Plaintiff's migraine headaches responded well to Ultram. (Tr. 589-91).

***Evidence Related to Mental Impairments***

On March 1, 2010, Plaintiff underwent a diagnostic assessment with Sussan Casselman, PSY, seeking treatment for depression stemming from her abusive childhood. (Tr. 553-54). Dr.

9

Casselman indicated Plaintiff was Spanish speaking and required either a translator or a Spanish-speaking therapist. (Tr. 554). Dr. Casselman diagnosed dysthymic disorder and post-traumatic stress disorder and recommended Plaintiff develop coping and assertiveness skills. (Tr. 555).

Plaintiff had four visits with psychiatrist Sarah Adlakha between July 21, 2010, and April 21, 2011, where she focused on medication management. (Tr. 708-717). On July 21, 2010, Plaintiff reported not doing well, although she thought the medication was partially effective. (Tr. 717). She complained of poor motivation and energy and being irritable with her husband. (Tr. 717). However, since that time, Plaintiff reported doing "OK", although not back to baseline, and looking forward to taking summer trips. (Tr. 708, 711, 714). On February 24, 2011, Dr. Adlakha noted Plaintiff was starting to engage in "risky behavior concerning other men at night clubs", but had not been unfaithful to her husband. (Tr. 711). Dr. Adlakha routinely reported unremarkable mental status examinations, assigned overall GAF scores of either 65 or 70[1], and advised Plaintiff to continue her current medication regimen. (Tr. 709-10, 712-13, 715-16, 718-19).

*State Agency Review and Examination*

On November 27, 2009, Kathryn Drew, M.D., reviewed the medical evidence and provided a physical RFC assessment. (Tr. 473). She concluded Plaintiff had no exertional,

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

postural, manipulative, visual, communicative, or environmental limitations, except she should avoid unprotected heights or open hazards due to dizzy spells. (Tr. 473-77).

On March 10, 2010, Christopher C. Layne, Ph.D., examined Plaintiff and completed a consultative examination report where he indicated Plaintiff exaggerated her symptoms. (Tr. 542). He noted Plaintiff showed no signs of depression during the examination and "has had roughly 8 jobs and she has never lost one because of any disability[]". (Tr. 542). Dr. Layne recounted Plaintiff's difficult childhood and claims of depression and anxiety, but noted she had never had treatment for any mental problems. (Tr. 542). Dr. Layne concluded Plaintiff's only major problem was that she was not entirely fluid in English. (Tr. 545). However, she "spoke English surprisingly well" and "rarely used the interpreter". (Tr. 543). He assigned a GAF score of 81[2] and stated Plaintiff was not impaired in abilities to understand or follow instructions; maintain attention to simple, repetitive tasks; relate to others, including coworkers; withstand the stress of day-to-day work; or manage money. (Tr. 545-46).

Alice Chambly, Psy.D., completed a psychiatric review technique on March 12, 2010, where she concluded Plaintiff had no limitations and would be able to do all work-related activity. (Tr. 525-38).

### VE Testimony and ALJ Decision

The ALJ described a hypothetical individual of the same age, education, and work experience as Plaintiff, who was limited to a range of light work, including occupations which did not require complex written or verbal communication, frequent verbal communication, or

---

2. A GAF score between 81 and 90 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." *Id.*

frequent telephone communication. (Tr. 81-85). The VE opined such a person could work as a packager or assembler. (Tr. 81-85).

Plaintiff's attorney questioned the VE regarding whether an illiterate individual could perform those jobs. (Tr. 87). The VE's opinion was unchanged because it was "clear" to the VE that the hypothetical individual was unable to read or communicate. (Tr. 87). There was also some debate about whether the DOT included language and reading levels. (Tr. 87-89).

On August 26, 2011, the ALJ determined Plaintiff suffered from severe impairments, including history of pituitary microadenoma, history of migraine headaches, mild degenerative changes of the thoracic spine, fibromyalgia, major depressive disorder, and post-traumatic stress disorder. (Tr. 34). The ALJ found these impairments did not meet or medically equal a listed impairment. (Tr. 35).

Next, the ALJ determined Plaintiff had the RFC to perform a range of light work, except she required work that allowed her to sit or stand alternatively at will, and she could never climb ladders, ropes, or scaffolds. (Tr. 37). Further, she must avoid all use of moving machinery and exposure to unprotected heights and was limited to occupations that did not require complex written or verbal communication, frequent verbal communication, or frequent telephone communication. (Tr. 37). Plaintiff could do only simple, routine, and repetitive tasks in a work environment that was free of fast-paced production requirements and involved only simple work-related decisions and routine work place changes. (Tr. 37). Plaintiff required work that was isolated from the public and involved only occasional supervision and occasional interaction with co-workers. (Tr. 37).

The ALJ concluded Plaintiff had a marginal education and could not communicate in English. (Tr. 41). Based on VE testimony, the ALJ determined Plaintiff could perform work as a packager and assembler, and was therefore, not disabled. (Tr. 42).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if she satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Generally, Plaintiff argues the ALJ erred by: 1) not classifying Plaintiff as "illiterate"; 2) relying on VE testimony that was not credible or supported by substantial evidence; and 3) failing to consider the additional impact of Plaintiff's obesity and fibromyalgia on her other impairments. (Doc. 14, at 13, 18, 24). Each argument is addressed in turn.

14

***Literacy Determination***

First, Plaintiff argues the ALJ erred by finding Plaintiff had a marginal education, rather than classifying her as functionally illiterate. (Doc. 14, at 14). In response, the Commissioner argues the ALJ's finding was supported by substantial evidence, and in the alternative, is not relevant because the ALJ relied on VE testimony that the hypothetical person was illiterate. (Doc. 15, at 15).

The regulations define illiteracy as the "inability to read or write." 20 C.F.R. § 404.1564(b)(1). A claimant is considered illiterate if he or she "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name". *Id*. Further, someone who is illiterate generally has "little or no formal schooling." *Id*.

A marginal education includes an ability in "reasoning, arithmetic, and language skills which are needed to do simple, unskilled type jobs." 20 C.F.R. § 404.1564(b)(2). Generally, formal schooling at the sixth grade level or less is a marginal education. *Id*.

The ability to communicate in English is relevant to the ALJ's education determination. *Garcia v. Sec'y of Health & Human Servs*, 46 F.3d 552, 554 (6th Cir. 1995). The regulations acknowledge that English is the dominant language of this country, so it may be difficult for someone who does not speak English to get a job. 20 C.F.R. § 404.1564(b)(5). However, the ability to communicate in English is not dispositive to the determination of disability. Indeed:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. . . . Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English.

15

*Deaton v. Comm'r of Soc. Sec.*, 315 F. App'x 595, 599-600 (6th Cir. 2009) (quoting 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(i)).

Here, during the hearing, the ALJ elicited testimony through an interpreter that Plaintiff attended school through the seventh grade, but did not question Plaintiff about her ability to read, write, understand, or speak English; nor did Plaintiff's attorney. (Tr. 53, 71-78). Certainly, Plaintiff's seventh grade formal education completed in Puerto Rico is "likely of limited value in assessing [her] present educational level or [her] ability to read, understand, speak and write English for purposes of the Social Security regulations." *Figueroa v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 14057, at *23 (N.D. Ohio). Nevertheless, the ALJ based her literacy determination on substantial evidence.

To this end, she determined Plaintiff was a younger individual with a marginal education and unable to communicate in English. (Tr. 14). The ALJ acknowledged that Plaintiff used a Spanish interpreter at the hearing. (Tr. 31). However, the presence of a translator does not automatically raise an illiteracy argument. *Motin v. Comm'r of Soc. Sec*., 2010 U.S. Dist. LEXIS 42416, at *9-10 (E.D. Mich.). "[E]ven if the presence of a translator could 'tacitly' raise an argument, it would be based on an ability to communicate in English," which the ALJ in this case considered. *Id.* Further, the ALJ took into account Plaintiff's employment history, including as a tortilla packer for several years, a food preparer for over a year at P.F. Chang's, and a server, cashier, and cook for three years. (Tr. 31, *referring to*, Tr. 304, 309, 365). The ALJ also noted that Dr. Layne indicated Plaintiff spoke English well, rarely used the interpreter, and ate out at restaurants. (Tr. 36, *referring to*, Tr. 543).

16

Although the record establishes Plaintiff has a limited ability to speak English, the ALJ considered this limitation in the RFC and step five determinations. (Tr. 31, 37, 41). Indeed, the ALJ limited Plaintiff to work which did not require complex written or verbal communication, frequent verbal communication, or frequent telephone communication and work which was isolated from the public with only occasional supervision and interaction with co-workers. (Tr. 37).

Moreover, "it is well established that the plaintiff—and not the ALJ—has the burden to produce evidence in support of a disability claim". *Black v. Comm'r of SSA*, 2012 U.S. Dist. LEXIS 140155, at *16-17 (N.D. Ohio) (citing *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008)). Plaintiff has put forth no evidence of her inability to work in the economy due to her education. On the contrary, Plaintiff has held several jobs and stopped working only because of a high risk pregnancy, as opposed to any alleged disability. (Tr. 53-54).

For these reasons, Plaintiff's argument that the ALJ's literacy determination is not supported by substantial evidence is without merit. *See*, *Dantzer v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 31174, at *11-13 (N.D. Ohio) ("While there is record evidence suggesting Plaintiff is illiterate, this Court's obligation is to determine whether the ALJ's decision is supported by substantial evidence.") (internal citations omitted).

Relatedly, Plaintiff argues the ALJ, "did not find [P]laintiff had 'limited education' [i.e. 7th grade through 11th grade formal schooling] but instead, put [P]laintiff under marginal, but does not indicate why [s]he did so." (Doc. 14, at 23).

The code sets forth:

[T]he numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no

17

other evidence to contradict it, we will use your numerical grade level to determine your educational abilities. The term "education" also includes how well you are able to communicate in English since this ability is often acquired or improved by education.

20 C.F.R. § 416.964(b).

Upon review, the ALJ did not expressly say she was downgrading Plaintiff's educational level from limited to marginal. However, the Code does not require such discussion. The ALJ adequately considered Plaintiff's limited English-speaking ability and previous work history. (Tr. 31). Curiously, Plaintiff argues her education determination should be lower than her numerical grade level, and also complains the ALJ did not provide sufficient reasons for making an education determination that is in fact below Plaintiff's numerical grade level.

Plaintiff relies on *Mejias v. Comm'r of Soc. Sec.*, 2009 U.S. Dist. LEXIS 22516 (N.D. Ohio) and *Skinner v. Sec'y of Health and Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990) to argue the ALJ's education determination is not supported by substantial evidence. However, these cases are distinguishable. (Docs. 14, at 16-17; 17, at 9).

In *Meijas*, the claimant's attorney, on cross-examination, began to ask about each position's general education requirement, but the ALJ interrupted him as the hearing had extended past noon. *Meijas*, 2009 U.S. Dist. LEXIS 22516, at *8-9. The Court remanded because the ALJ prevented counsel from revealing any conflict between the VE's testimony and the DOT. *Id.*, at *9. Further, the Court construed the DOT education levels as a minimum, rather than the maximum required for a particular job. *See Lewis v. Comm'r of Soc. Sec.*, 2013 WL 5563764, at *34 (N.D. Ohio) (finding that the education levels listed in the DOT are maximum, not minimum, requirements). Based on this observation, the Court found the error was not harmless because there was a conflict between the VE's testimony and the DOT. *Id.*, at *10-12.

18

Unlike in *Meijas*, Plaintiff's cross-examination of the VE was not interrupted or cut short. Plaintiff had a full opportunity to reveal any conflicts between the VE testimony and the DOT, but none were revealed. This point is further explained in the Court's discussion of SSR 00-4p, below.

Turning to *Skinner*, the claimant there testified he had a third grade education and also scored at the third grade reading level on a wide range achievement test. *Skinner*, 902 F.2d at 448. However, the ALJ determined the claimant had a marginal education based on the fact his disability report stated he had an eighth grade education. *Id*. at 450-51. Finding that a person who reads below a third grade reading level is "functionally illiterate", the Court remanded the case. *Id*.

Here, there is no evidence of reading ability aside from the fact Plaintiff's first language is Spanish. Plaintiff did not testify as to whether she could read at the hearing and there is no apparent objective evidence of record. Moreover, the ALJ supported her decision with Plaintiff's job history, school record, and the observations of treatment providers. Therefore, *Skinner* is distinguishable from the case at bar.

For the reasons stated above and finding no clear violation of the code, the undersigned recommends finding the ALJ's literacy determination supported by substantial evidence. Further, any error regarding Plaintiff's education was harmless because the ALJ relied on VE testimony which understood Plaintiff to be illiterate. (Tr. 87-89).

***Step Five Hypothetical***

Scattered throughout her briefs, Plaintiff raises several arguments relating to the ALJ's step five determination. Each argument is construed to the best of the Court's ability, as follows below.

SSR 00-4p

First, Plaintiff argues the VE was required to be familiar with the DOT's "trailer", which sets forth various symbols for language, reasoning, and math levels. (*See, e.g.,* Docs. 14, at 20; 17, at 6). Plaintiff further argues the Commissioner had a duty to clarify the requisite language level required for an assembler or packager because the DOT descriptions for assembler and packager required levels of reasoning, language, and/or math that exceeded Plaintiff's capabilities, as raised at the hearing and in subsequent post-hearing briefs.[3] (*See, e.g.,* Doc. 14, at 17, 18-19). In response, the Commissioner argues Plaintiff's SSR 00-4p argument is irrelevant because no conflict exists between the DOT and VE testimony. (Doc. 15, at 16).

Social Security Ruling 00-4p requires, "[w]hen vocational evidence provided by a vocational expert or occupational specialist is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the vocational expert or vocational specialist evidence to support a determination or decision that the individual is or is not disabled." 2000 WL 1898704. However, the existence of a conflict does not necessarily require remand.

Indeed, the Sixth Circuit has held, "the ALJ and [VE] are not bound by the [DOT] in making disability determinations because the Social Security regulations do not obligate them to

---

3. The ALJ has no duty to address conflicts first raised in post-hearing briefs. *Coffel v. Astrue*, 2009 U.S. Dist. LEXIS 126275, at *16-21 (E.D. Tenn.) (collecting cases).

20

rely on the Dictionary's classifications." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003). "Thus, the fact that the job titles to which the VE testifies does not line up perfectly with the DOT does not render the VE's testimony inconsistent with the DOT as a whole." *Kane v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 58012, at *52-53 (E.D. Mich.) (*citing Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009)).

The DOT's "trailers" list only the "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." *Lewis*, 2013 WL 5563764, at *34 (citing SSR 00-4p). On this, Judge Joseph M. Hood explained:

> According to the DOT, a person must be somewhat literate in order to work. The lowest level of language development the DOT recognizes is a ranking of 1, which constitutes the following: "Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute." Department of Labor, Dictionary of Occupational Titles (4th ed.1991) at Appendix C. The DOT simply does not take illiterate individuals into consideration. However, commonsense and the regulatory medical-vocational guideline sections tell us that many illiterate people can and do work. *See e.g.*, 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.00(g)(2008). In situations such as these the Sixth Circuit has held that the ALJ is entitled to accept the testimony of a vocational expert without having to rely on the DOT. *See Strong v. Social Sec. Admin.*, 88 Fed. Appx. 841, 847 (6th Cir.2004)("An ALJ may rely on vocational expert testimony notwithstanding contrary conclusions in the DOT if the expert is found to be credible, and the question posed to the expert accurately reflects the claimant's physical and mental limitations.")(*citing Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.1994))).

*Rowe v. Astrue*, 2008 WL 1711538, at *3 (E.D. Ky.).

Here, there is no dispute the ALJ asked the VE whether his testimony was consistent with the DOT. Rather, Plaintiff's argument challenges the following dialogue between the VE and Plaintiff's counsel:

> Q:     These jobs that you've listed, what is the educational level that is necessary for such job as listed in the DOT in terms of reading level, math

          level, that sort of thing, particularly reading level? I'm most interest in that.

VE:     I'm not sure.

Q:     So, I want to be clear. In these hypotheticals I want you to assume for a moment the claimant is illiterate.

VE:     I understand.

Q:     Okay, as opposed –

VE:     That was clear in the – she is unable to read and unable to communicate. That was clear in the judge's hypotheticals.

Q:     So, you don't know what the reading level would be.

VE:     It would be no reading at all. It would be – to learn the job could be simple observation as she learned to do the tortilla packing.

Q:     Well, I got that for an – yeah, I got that as an SVP of two, that it would be unskilled.

VE:     Right, there would be no reading involved.

Q:     But no reading

VE:     Correct.

Q:     And not to sound funny here, but is that as per your testimony or is that as what I'm going to find when I look at the DOT on these jobs?

VE:     Where is DOT listing for reading?

Q:     It lists reading, language.

VE:     Language is reading.

Q:     I believe it includes also reading of it.

VE:     Okay.

Q:     Yes, education [INAUDIBLE]

VE:    I didn't know that there was a reading level in the DOT, but if you're describing the language level – is that correct?

Q:    Yes.

* * *

Q:    I get that, but for example R is the reasoning level, the L1 is language level.

VE:    Okay, very good, then L is one, which would be no reading or very limited reading.

(Tr. 87-90).

From this dialogue, it is clear any discrepancy in the "reading" level was resolved because reading ability is encompassed in language level. Further, the VE correctly opined that a packager requires, at most, very limited reading skills. (Tr. 90).

Indeed, despite the discussion on cross-examination concerning reading, language, and/or math levels identified by the DOT's "trailers", the VE never identified a conflict between his testimony and the DOT. *Kane*, 2013 U.S. Dist. LEXIS 58012, at *50 ("the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p") (*citing Lindsley*, 560 F.3d at 606). Nor is a conflict apparent. Plaintiff's counsel was afforded a full and fair opportunity to cross examine the VE. Even though the ALJ did interrupt Plaintiff's counsel during the cross-examination, Plaintiff's counsel was afforded an opportunity for additional questioning, but indicated he had no further questions of the VE. (Tr. 92).

In sum, the ALJ did "all that was required by social security regulations by inquiring about conflicts." *Antico v. Astrue*, 2012 WL 5438988, at *10 (S.D. Ohio). Where no conflict was identified, the ALJ was under no obligation to "obtain a reasonable explanation for . . . [the]

23

apparent conflict." *Id*. (quoting *Lindsley*, 560 F.3d at 603). Despite the language, reasoning, or math levels listed in the DOT, the ALJ could reasonably rely on VE testimony that Plaintiff could perform the jobs because the VE testified there was no conflict between his testimony and the DOT, reliance on the definitional requirements for jobs listed in the DOT is not binding, the range of requirements is not a minimum, but a maximum range, and the ALJ was under no obligation to investigate the accuracy of the VE's testimony beyond the SSR 00-4p inquiry. For these reasons, Plaintiff's contention that she cannot read at the listed level for packager or assembler is not well-taken.

To the extent Plaintiff argues the VE had a general duty to be aware of existence of the DOT's trailers, that argument is not well-taken; both because review of the transcript does not support such an argument and because Plaintiff has provided no legal support for this proposition. (Doc. 14, at 17). Moreover, neither the VE nor the ALJ are "bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) (quoting *Wright*, 321 F.3d at 616).

Substantial Evidence

Next, Plaintiff argues generally that the VE's testimony was not credible and does not amount to substantial evidence with which the ALJ could support her step five determination. (Doc. 14, at 18-20, 23-24). In particular, Plaintiff takes issue with the ALJ limiting Plaintiff to no complex written or verbal communication or frequent telephone communication. (Doc. 14, at 23). In response, the Commissioner argues substantial evidence supports the ALJ's reliance on the VE's testimony. (Doc. 15, at 17).

24

To meet her burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

First, it is worth noting that Plaintiff admits she is not completely incompetent when it comes to the English language. In this regard, Plaintiff avers, "[i]t has never been suggested or argued by Plaintiff or her counsel, that she cannot speak some English and understand some English, but rather, she has the functional educational level of third grade reading in English or less, which constitutes functional illiteracy." (Doc. 17, at 2). Moreover, "Plaintiff's English is at best, limited to very simple". (Doc. 14, at 23). As discussed above, Plaintiff has not provided evidence of Plaintiff's reading level, and the ALJ's literacy determination is supported by

25

substantial evidence. Further, Plaintiff's own assertions negate her argument that she cannot engage in occasional verbal communication.

Regardless, the ALJ properly relied on the VE's testimony as it accurately encompassed all of Plaintiff's significant limitations that are supported in the record. Indeed, the ALJ relied on VE testimony which considered someone of Plaintiff's age, education, and work experience who retained the ability to engage in a range of light work that involved lifting/carrying up to ten pounds frequently and twenty pounds occasionally; sitting, standing, or walking for six hours in an eight-hour workday; required an at-will sit/stand option; never required using moving machinery, exposure to unprotected heights, or climbing ladders, ropes, or scaffolds; involved frequent balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; was limited to simple, routine, and repetitive tasks performed in a work environment that was free of fast-paced production requirements and entailed only simple work-related decisions and routine workplace changes; was isolated from the public and involved only occasional supervision and occasional interaction with coworkers; and was limited to occupations that did not require complex written or verbal communication, frequent verbal communication, or frequent telephone communication. (Tr. 81-84). Upon review, these restrictions accurately reflect the ALJ's RFC determination and Plaintiff's abilities. *See, Casey*, 987 F.2d at 1235 (ALJ is required to accept only those limitations accepted as credible).

To the extent Plaintiff challenges the fact the ALJ did not explicitly state in her hypothetical questions that Plaintiff had a limited ability to communicate in English, that does not result in reversible error. *Mohssen v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 165782, at *23-24 (E.D. Mich.) ("While it is true that the ALJ did not explicitly state in his hypothetical

26

questions that [claimant] has a limited ability to communicate in English, this did not result in any reversible error; the VE was present at the hearing and had the opportunity to observe that [claimant] testified through an interpreter."). The VE ostensibly took into account Plaintiff's illiteracy because the only way to understand Plaintiff was through an interpreter. Further, the VE considered Plaintiff's reading ability and capacity to speak English in reaching his conclusions regarding Plaintiff's ability to work. *Ramierz v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 86126, at *22 (E.D. Mich.).

Similarly, Plaintiff's allegation that a sit/stand option negates an ability to sit for six hours in an eight-hour workday is not well taken as it is unsupported, and not "confusing" as Plaintiff claims. (Doc. 17, at 9).

In sum, the VE testified that Plaintiff could work as a packager or assembler based on a hypothetical person of Plaintiff's same age, educational and vocational background, and RFC. The VE clearly opined that his opinion was consistent with someone who was unable to read or communicate. (Tr. 87). Plaintiff's counsel had a full and fair opportunity to cross-examine the VE. The ALJ supported her literacy determination with substantial evidence. Thus, the ALJ's step five determination is supported by substantial evidence. *C.f., Gonzalez v. Colvin*, 2014 U.S. Dist. LEXIS 42126, at *31-34 (N.D. Ohio) ("As a result of the VE's uncertain testimony and the ALJ's lack of explanation regarding Plaintiff's language barrier, is it unclear as to whether substantial evidence supports the ALJ's Step Five finding.").

Due Process Right to Confront Witness

Next, Plaintiff argues she was denied due process rights to confront the VE "with information that was provided to the ALJ which VE should have known of when testifying at

hearing; and certainly knew of it when submitting post hearing evidence to ALJ". (Doc. 14, at 22). Plaintiff is referring to the DOT's language, reasoning, and mathematics trailers. (Doc. 14, at 21). No legal support for this argument is evident in Plaintiff's brief.

The ALJ maintains that she faxed DOT numbers to Plaintiff's counsel two days after the hearing and as such, Plaintiff "had the opportunity to question the [VE] about the job titles, job totals, and corresponding duties for the representative medium exertional level jobs provided at the hearing." (Tr. 31). Plaintiff's counsel claims he "duly responded to that submission", apparently in his brief to the ALJ. (Doc. 14, at 21). Alternatively, the ALJ adds that the issue is moot, as Plaintiff was found capable of only light work. (Tr. 31).

Plaintiff's due process rights cannot be violated through failure to further cross-examine based on subsequently obtained reference numbers because "there is no requirement that a VE provide reference numbers for the jobs he/she identifies." *Creque v. Astrue*, 2011 U.S. Dist. LEXIS 102415, at *23 (N.D. Ohio), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 102804. As stated above, Plaintiff's attorney had ample opportunity to cross-examine the VE. Unable to identify an "apparent" conflict between the DOT and VE, Plaintiff attempted to do so through post-hearing briefing to the ALJ. However, no such conflict was ever made apparent to the ALJ. Neither Plaintiff's brief nor a reading of the record and hearing transcripts shows any basis to find that Plaintiff's due process rights were violated. Thus, Plaintiff's argument that she was denied due process rights is without merit.

### *Obesity and Fibromyalgia*

Next, Plaintiff argues the ALJ erred in failing to "properly consider the additional impact of Plaintiff's obesity on her musculoskeletal and other impairments, and failed to properly

28

address her fibromyalgia per SSR 12-2p, as required by SSR 02-1p; failure to do same, renders the decisin [sic] not based on substantial evidence." (Doc. 14, at 24). The ALJ's treatment of Plaintiff's obesity and fibromyalgia are supported by substantial evidence for the following reasons.

First, regarding obesity, Social Security Ruling (SSR) 02-1p, 2000 WL 628049, explains the Social Security Administration's policy on the evaluation of obesity, but "does not mandate a particular mode of analysis." *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006). The Sixth Circuit emphasizes the ALJ must "consider the claimant's obesity, in combination with other impairments" when making his decision. *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 577 (6th Cir. 2009) (citing *Bledsoe,* 165 F. App'x at 411-12). Although SSR 02-1p does not specify any precise "mode of analysis," the ruling has been interpreted, at a minimum, to require the ALJ to consider the claimant's obesity during the decision making process. *Id.* at 411-12. SSR 02-1p states:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time ... [O]ur RFC assessments must consider an individuals' maximum remaining ability to do sustained work activities in an ordinary work setting ona [sic] regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2000 WL 628049, *6. "The Sixth Circuit requires the ALJ to mention obesity either expressly or indirectly where the record indicates the effect of obesity on the claimant's impairments." *Young v. Comm'r of Soc. Sec.,* 2011 WL 2182869, *7 (N.D. Ohio).

Here, the ALJ did not find obesity was a severe impairment because "[o]besity is no longer a listed impairment". (Tr. 34). But, the ALJ continued, obesity was considered at step two and in formulating Plaintiff's RFC at the light level. (Tr. 35). Further, the ALJ afforded only

29

partial weight to the opinions of the state agency consultants because they did not properly consider the limiting effects of Plaintiff's obesity. (Tr. 39). Properly addressing the need to consider the effect of Plaintiff's obesity to do "sustained work activities in an ordinary work setting [on a] regular and continuing basis", the ALJ limited Plaintiff to light work such that she could only perform work that was "simple, routine, and repetitive" and "performed in a work environment that is free of fast paced production requirements". (Tr. 37); SSR 02-1p.

Where Plaintiff has not provided objective or credible evidence of the effect of Plaintiff's obesity on her ability to work, the ALJ's brief discussion of her decision to downgrade Plaintiff's ability to do medium work is supported by substantial evidence. *See*, *Young*, 2011 WL 2182869, at *21 ("where a claimant presents limited evidence of the effects of his obesity, the ALJ may give obesity less consideration").

Next, Plaintiff argues the ALJ did not adequately discuss or consider Plaintiff's severe impairment of fibromyalgia. (Doc. 14, at 24). Although there is some evidence in the record that Plaintiff had been diagnosed with, or at least suspected of having fibromyalgia (Tr. 650, 696), there is substantial evidence in the record supporting the conclusion Plaintiff's fibromyalgia was not totally disabling. *Jones*, 336 F.3d at 477 (Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

In this regard, Plaintiff engaged in a wide-range of activities, including walking her children to school every day, cooking, cleaning, and going to nightclubs. (Tr. 317-20, 340-43, 543). Further, the extent of Plaintiff's fibromyalgia treatment is limited to Dr. Syed's recommendation that Plaintiff start a comprehensive fibromyalgia program. (Tr. 644). The ALJ considered Dr. Syed's treatment of Plaintiff. (Tr. 39). However, based on the ALJ's decision and

30

the record, Dr. Syed never provided an opinion on Plaintiff's ability to work or commented on the severity of the condition; a point Plaintiff does not challenge. (Tr. 694-96).

Further, Plaintiff does not contest the ALJ's adverse credibility determination, even though a Plaintiff's subjective complaints are important as fibromyalgia is not confirmed by objective findings. *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988) ("There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion").

As the Sixth Circuit has said: "[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815). In this case, there is substantial evidence to support the ALJ's finding that Plaintiff's fibromyalgia is not entirely debilitating.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).